CHUBB LLOYDS INSURANCE COMPANY OF TEXAS, Appellant,

v.

H.C.B. MECHANICAL, INC., Appellee.

H.C.B. Mechanical, Inc., Appellant,

v.

Chubb Lloyds Insurance Company of Texas, Appellee.

No. 01–04–00572–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 8, 2005.

Bradford W. Irelan, Irelan & Associates and E. John Gorman, Houston, TX, for appellant.

Lynda Kae Stewart and Randy L. Fairless, Johanson & Fairless, L.L.P., Sugar Land, TX, for appellee.

Panel consists of Justices NUCHIA, JENNINGS, and HIGLEY.

## OPINION

SAM NUCHIA, Justice.

After settling a claim by John Knapp for damages caused by a fire at his at residence, Chubb Lloyds Insurance Company ("Chubb") brought a subrogation suit sounding in negligence against H.C.B. Mechanical, Inc. ("HCB"). The jury found HCB negligent, awarding damages to Chubb in the amount of $40,000, and the trial court rendered judgment on the verdict. Chubb appeals from the damages award, and H.C.B. appeals from the negligence finding. We reverse the trial court's judgment and render judgment that Chubb take nothing.

## BACKGROUND

At approximately 8:42 p.m. on November 7, 2000, a neighbor of John Knapp called the Houston Fire Department to report a fire at Knapp's home. The home, located in a gated community, was currently undergoing significant renovations. After firefighters put out the fire, the Houston Fire Department's Arson Bureau was called in to determine the cause of the fire.[1] Mike Zigal was the lead investigator in determining the cause of the fire at the

Knapp's house and wrote the final report. Because they could not identify any accidental cause, Zigal concluded, and his two fellow investigators agreed, that the "catchall" or default option of arson should be listed on the bureau's report as the cause of the fire, although the investigation remained open.

The day after the fire, Chubb sent out its hired fire investigator, Mike Southerland, who was employed with S.E.A., Inc. (SEA). After conducting his investigation, Southerland concluded that the fire started from one of three possible accidental causes: (1) a "drop light"[2] used by HCB; (2) a plumbing torch used by HCB; or (3) a carelessly discarded cigarette by an HCB worker. Chubb's pleadings also alleged that, in the alternative, HCB's failure to properly secure the residence allowed an arsonist to enter the house and set it alight.

HCB was the sub-contractor hired by CECO Contractors to perform the plumbing work needed to convert one large bathroom into two smaller bathrooms. In order to accomplish this, HCB had to jackhammer two holes in the concrete foundation about five feet apart. Both the Arson Bureau and Southerland agreed that the fire originated in the smaller of the two holes in bathroom area.

For any of Southerland's fire origination theories to prove correct, the existence of trash or debris in the hole where the fire started was crucial so that there would be a "combustible." While it was undisputed

1. If the initial fire suppression team is not able to readily determine the cause of the fire, the Arson Bureau is called in to determine such. The name of the bureau is somewhat of a misnomer because their job is to determine the cause and origin of fires, no matter whether the cause is arson or otherwise.

2. As defined at trial, a "drop light" is akin to a light one would hang on the underside of the hood of a car while performing repairs on it in order to illuminate the area more effectively.

that there was trash—consisting mostly of "paper and debris"—in the hole, it was not clear from the evidence how it got there. Southerland speculated that HCB's workers may have left it in the hole and then left for the day. Southerland did testify that he had no personal knowledge of trash being in the hole because the hole had been excavated when he arrived the next day. Nor could anyone explain why the trash found in the hole in which the fire originated was not consumed by the fire. It was also noted that a one-half full gasoline can and other flammable liquids on the premises were not disturbed. Finally, it was undisputed that only HCB had workers at the residence on the day of the fire.

### HCB'S LIABILITY

HCB contends that the evidence is legally insufficient to support the jury's finding of negligence because there is no evidence that it breached its duty or proximately caused the fire at the Knapp residence.

### Standard of Review

The supreme court recently discussed the appropriate standard of review for legal sufficiency challenges in *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex.2005). The court concluded that "[t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.... [L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at 827.

When reviewing a no-evidence point of error, "all the record evidence must be considered in the light most favorable to the party in whose favor the verdict has been rendered, and every reasonable infer-ence deducible from the evidence is to be indulged in that party's favor." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). "Anything more than a scintilla of evidence is legally sufficient to support the finding." *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998).

### 1. The Plumbing Torch Theory

■ On the day of the fire, Patrick Embry, the supervisor of the HCB plumbing crew, used a plumbing torch early in the afternoon to melt out the lead in the joints of the pipes where he was working. When using a plumber's torch on these types of pipes a material called "yocum"—a rope like substance which prevents the hot lead from leaking into the pipe being worked on—is loosened from the pipes. This material emanates smoke and gives off an unpleasant odor when burned. In the process of using the torch, Embry removed some of the smoldering yocum from the hole he was working in, by having one of the day laborers pick it up with a shovel and take it to the dumpster outside. It is undisputed that Embry was working in the hole opposite from where the fire started, and that he stopped using the torch around 2:00 p.m. Embry and the other HCB workers left the Knapp residence at 5:00 p.m.

Southerland explained his theory as to how the smoldering yocum could have caused the fire as thus:

If we had some smoldering material and to get it out of the way and remove it they threw it back over near this hole that we're talking about [where the fire originated], actually threw that smoldering material over there or something, it could have laid there and smoldered and set combustibles on fire after they had left for the day.

Chubb relies on three cases in urging us to uphold the jury's negligence finding. Attempting to draw a parallel to the instant facts, Chubb points to *Redman Homes, Inc. v. Ivy* for the proposition that a fire investigator (like Southerland) can point to "the *possible* cause of the fire." 920 S.W.2d 664, 668 (Tex.1996) (emphasis in Chubb's Brief). However, Chubb's argument places the emphasis on the wrong word; in *Redman Homes*, the fire investigator eliminated all other causes "leaving *only* the wiring running underneath the bathroom floor as *the* possible cause of the fire." *Id.* (emphasis added). Moreover, the fire investigator in that case was able to point toward the "burning pattern in the Ivys' home [as] consistent with the manner in which the fires caused by faulty wiring are known to spread." *Id.*

Here, however, Southerland testified as to three distinct possible scenarios—this is not analogous to the *Redman Homes* situation where the investigator, by process of elimination, narrowed the cause to only one possibility coupled with additional evidence as to why that theory could be the only correct one. *Id.* In doing this, the investigator in *Redman Homes*, by definition, no longer had a "possible" cause, but *the* cause. Southerland's testimony did not eliminate any of the possible causes; therefore *Redman* is of no help to Chubb.

Chubb also relies on two other cases for the proposition that HCB cannot disparage Southerland's description of the various scenarios as "possibilities" because, taken in context, "possibility" (and its variants) can mean "probablity." *See Otis Elevator Co. v. Wood*, 436 S.W.2d 324, 331–332 (Tex. 1968) ("it is the substance, not the form, of the testimony that is determinative"); *Ralph v. Mr. Paul's Shoes, Inc.*, 572 S.W.2d 812, 814 (Tex.Civ.App.-Corpus Christi 1978, writ ref'd n.r.e.) (expert's opinion expressing probabilities as opposed to pure conjecture is not matter of semantics but court should look to entire substance of expert's testimony).

However, Chubb's reliance on these cases only gets them halfway to where they want to be. It is true that this court should not engage in semantic exercises and instead should look at the substance of Southerland's testimony. However, once the testimony regarding the plumbing torch is examined, it is clear that no substance exists.

In *Marathon Corp.v. Pitzner*, the Texas Supreme Court reiterated the basics of proving up the proximate cause element of a negligence cause of action.

> The components of proximate cause are cause in fact and foreseeability. The test for cause in fact, or "but for causation," is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred. A finding of cause in fact may be based on either direct or circumstantial evidence, but cannot be supported by mere conjecture, guess, or speculation.

106 S.W.3d 724, 727 (Tex.2003) (citations omitted). In explaining further, the court went on to remind: "as we have frequently said, some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence. We have also said that an inference stacked only on other inferences is not legally sufficient evidence." *Id.* at 728 (citations omitted) (holding that expert's opinion on proximate causation amounted to no more than mere conjecture and speculation as to events surrounding accident).

"Expert opinions must be supported by facts in evidence, not conjecture." *Id.* at 729. Southerland's theory that the plumber's torch was a possible cause of the fire can only be classified as

guesswork. From the known fact that at some point on the day of the fire there was smoldering yocum in a hole near where the fire originated, one would have to infer that the worker, while taking the yocum outside, either threw or let fall from the shovel some yocum into the hole where the fire originated, that the yocum smoldered from 2:00 p.m. until sometime before 8:42 p.m.—when the fire was reported—and that this then caused the trash found in the fire-originating hole, the presence of which could not be fully explained, to catch flame, causing the house to burn.

We cannot uphold a finding of negligence under the plumbing torch theory because there are simply too many inferences upon inferences that must be stacked to reach the causation element. "[I]n cases with only slight circumstantial evidence, something else must be found in the record to corroborate the probability of the fact's existence or non-existence. That 'something else' is absent in this case." *Id.* There is no evidence that the plumbing torch proximately caused the fire at the Knapp residence.

### 2. Smoldering Cigarette Theory

■ Alternatively, Southerland theorized that a smoldering cigarette from Embry or one of the other HCB workers may have started the fire. Southerland testified as follows:

> A: When someone is smoking, if they're a smoker, they have a tendency to throw their cigarette away or throw it down. . If a cigarette had been thrown down, if someone had been smoking in this area, threw a cigarette over near that hole, it laid there near combustibles, smoldered for awhile. After they left, it could have burst into flames.

Q: Okay. Now, again, what is your understanding of when the HCB Mechanical employees like Patrick Embry when [sic] they left that day?

A: He told me he left about 5:00 p.m. He did tell me he was a smoker. If he had been smoking in that area, he could have thrown a cigarette down without even thinking, and he could have actually thrown his cigarette down and left for the day and it smoldered and then started a fire later.

Patrick Embry testified at trial that he was a smoker and that he smoked at the Knapp residence on the day of the fire. Embry also testified that in the past he smoked indoors at commercial building jobs. There was also testimony from Embry's supervisor that he had seen discarded cigarette butts on the floor of the work area after the fire at the Knapp residence.

Chubb argues that, given this evidence, the jury could infer that Embry negligently started the fire. However, this theory also collapses under the weight of the multiple inferences that must be stacked in order to reach Southerland's scenario. This testimony only establishes that Embry smoked on the day of the fire; from there, the fact finder must infer that Embry (or another HCB worker) (1) smoked a cigarette by the hole where the fire originated; (2) carelessly or accidentally flicked a still burning cigarette into the hole; (3) the cigarette smoldered for at least a few hours (if we grant that the lit cigarette found its way into the hole at the latest possible time—5:00 p.m. when the HCB workers left); (4) the cigarette eventually caught the trash and debris on fire; and (5) that HCB was responsible for, or at least knew of, the trash and debris in the hole when the cigarette was flicked.[3]

---

3. Furthermore, Southerland's basis for the fact that a cigarette can smolder for the

amount of time it would have had to in order to start a fire at the Knapp residence—and

"Expert opinion must be supported by facts in evidence, not conjecture." *Id.* Again, "in cases with only slight circumstantial evidence, something else must be found in the record to corroborate the probability of the fact's existence or nonexistence." *Id.* Here, as with the plumbing torch theory, that something else is absent in this case. *See id.* There is no evidence that a cigarette discarded carelessly or accidentally by an HCB employee proximately caused the fire at the Knapp residence.

### 3. The Drop Light Theory

■ The last in the trio of Southerland's theories was that a drop light found in the hole where the fire originated caused the fire at the Knapp's residence. Southerland theorized that the light was left energized when the HCB workers left at 5:00 p.m. Southerland stated that he based this on a conversation he had with Zigal, in which Zigal stated that the drop light was probably plugged in during the fire. Southerland conceded that, because he first arrived at the Knapp house the day following the fire, he had no personal knowledge about whether the wire was plugged in and could not recall when the alleged conversation with Zigal had taken place. Zigal himself testified that the cord was unplugged when he arrived at the Knapp's residence and none of the first responder firefighters told him that they had unplugged the drop light during the course of suppressing the fire.

Zigal came to the conclusion that the drop light was unplugged because soot was covering the outlet, and if the light had been plugged in, there would have been a

clear area the size of the plug on the outlet. The electrical engineer who examined the cord of the drop light found no evidence of "arcing and bending"—where parts of the electrical wire become so hot that they soften and sputter off by force of the arc—that would indicate that it had been plugged in during the fire.

Looking at the evidence, as we must, in the light most favorable to the verdict, Southerland's drop light theory suffers from the same fatal flaw as preceding theories: it is premised on complete conjecture—coupled with a total lack of personal knowledge. *See City of Keller*, 168 S.W.3d at 827. Therefore, Chubb supplied the jury with *no* evidence to consider at all. Again, we defer to the supreme court's language in *Marathon Corp*: "[e]xpert opinions must be supported by facts in evidence, not conjecture." *Id.* Again, the something else necessary to corroborate Southerland's drop light theory is absent in this case. *See id.*

### 4. Arson Theory

■ Chubb's last, alternative theory was that HCB was negligent in not securing the door, thereby allowing an arsonist to walk into the house and set it ablaze. Chubb again urges this argument on appeal. However, this argument places the analytical cart before the horse. We must first determine whether there is any evidence of arson in the record before we can know whether there can be any injury flowing from such.

The only possible basis for a finding of negligence under the arson theory is the Arson Bureau's report.[4] The arson inves-

Zigal believed that a cigarette could only smolder under such conditions for no longer than two hours—was factually far afield from the instant facts. Southerland cited a textbook which stated that at least on one occa-

sion a cigarette had smoldered on an upholstered chair for slightly more than five hours.

4. It is worth noting that during trial Chubb repeatedly disparaged Zigal's arson theory

tigators concluded in their report that arson was the catchall or "default" cause of the fire because they believed they had ruled out all accidental causes. Chubb's trial counsel and Zigal had these exchanges at trial:

Q: So, the best you can do is you can sift through the ashes and try to deduce by looking at what happened like the heat and the way the fire came and the direction [of] the flame pattern and that sort of stuff, right?

A: Right.

Q: That's about the best you can do?

A: Right.

Q: And based on all the stuff that you gather you come up with your best guess on how this fire occurred?

A: Right.

Q: Based on evidence, right?

A: Right.

\* \* \*

Q: What you did not find in this house were gas pour patterns all the way through this house. True?

A: That's correct.

Q: And isn't it a fact whenever somebody really wants to torch a house, investigated them yourself, you've seen gasoline pour patterns.

A: I have.

Q: Great way to burn a house down is take a gas can, like the arsonist that walked by the night of this fire, and take this gas and just pour it down each one of the carpeted runs, right?

A: That's one way.

Q: Right. And as you mentioned earlier, that gas makes that thing go up fast, correct?

A: Right.

Q: But you didn't find pour patterns?

A: No, I didn't.

Again, we note that an "[e]xpert['s] opinions must be supported *by facts in evidence, not conjecture.*" *Id.* at 729 (emphasis added). Here, the Arson Bureau's report stating that the cause of the fire was arson was really a "negative conclusion." That is, the report's "conclusion" was really not a conclusion at all—saying that some other events, especially so in the instant context, could not or did not occur, does not, without more, make another alternative the definitive cause. Zigal conceded at trial that the investigation into the fire was still "open" and the report was the product of a few hours spent at the Knapp residence on the night of the fire.[5]

Here, neither the Arson Bureau's report, nor anything else in the record, corroborates the probability of arson. Therefore, there is no evidence that arson was the cause of the fire.

## CONCLUSION

Chubb has produced neither direct nor circumstantial evidence to support the inferences necessary to establish any of its four theories of causation. Accordingly, we sustain HCB's issue. In light of this holding we need not address Chubb's damages issue. Accordingly, we reverse the trial court's judgment in its entirety and

---

and does so again on appeal when it serves Chubb's purposes.

**5.** We also note that *Redman Homes* is of no help to Chubb here either. Zigal's report pointed to no further "burning patterns" at the Knapp home that were consistent with arson—in fact, the above testimony shows

that none existed, as Chubb's counsel so eagerly pointed out. *Cf. Redman Homes*, 920 S.W.2d at 668 (fire investigator finding the burning pattern in plaintiff's home consistent with manner in which fires caused by faulty wiring, which was cause of fire, are known to spread).

render judgment that Chubba take-noth-ing.